Property, uh, Grand Reserve of Columbus v. Property-Owners Insurance Company, LLC. Property-Owners Insurance. Mr. Kendall. Good morning. Good morning. May it please the Court, my name is Mike Kendall. I represent the appellant, Property-Owners Insurance Company. Uh, Property-Owners is asking this court to vacate a judgment entered on a jury verdict in the district court below for four basic reasons. The first is that the court should not have allowed the plaintiff, appellee, Grand Reserve's expert, Brian Dansby, to testify in the face of a timely filed Daubert challenge. Two. Yeah, so, and your argument about that is that the trial court would have been required to make the determination of admissibility under Daubert before trial, right? Correct, Your Honor. We, we have said otherwise, albeit perhaps in dicta. Um, but, and it does not appear to me that there's any law, at least in this circuit, the Supreme Court, uh, maybe some other circuits, or in the rule, the Federal Rules of Evidence, that would require the district court to do that pre-trial. Um, I, can you help me with that? Yes, Your Honor. Our, our argument goes beyond just the fact that the judge did not rule on. I know, I'm just trying to take them one at a time. One at a time, I would concur with Your Honor that there's. That's number one, isn't it? Yes. As your number one argument. Correct, number one argument. And so, we, we would agree that the trial judge did not necessarily have to hold a hearing on the Daubert motion pre-trial. Right. Did not necessarily have to rule on the Daubert motion before the trial began. Okay. All right. So, the district court, then, if it doesn't have to do it before trial, and can wait until trial, um, it does appear to me that here where the district court had a pre, had some kind of pre-trial hearing about the matter and said, I'm going to reserve ruling on this until trial, then during the trial had, um, expert qualification, um, testimony and determined before the expert offered opinion evidence about causation or damages, um, concluded that at least with respect to causation, the methodology, um, was reliable. Um, doesn't that satisfy Daubert? We had raised in the Daubert motion other issues besides whether Dansby was qualified as an expert on whether his methodology was reliable. We had also challenged him on the basis of whether his testimony fit in the Daubert motion, which was not ruled on before he testified. And we also challenged him on the basis of whether his testimony was reliable and would be helpful to the jury, which the judge did not rule on. So... It seemed to me the judge did rule, at least implicitly, on all of that. Fit, our fit argument was, was that in the Daubert motion, was that, so, there was a dispute in this case about when this hailstorm occurred. When it was originally submitted to property owners, it had a July date of 2013, and then eventually it sort of morphed into a March 2013 date because there was no hailstorm that anybody could find in July of 2013. So, wasn't the, wasn't the judge and the jury, uh, capable of deciding that that was simply a mistake? Except that Mr. Dansby had testified in his deposition that the hail that he believed that he saw on these roofs could have happened six, seven, eight years before. So, without his ability to be able to fit his testimony to the facts of this case, which we challenged on the Daubert motion pretrial, it's our position that the judge did not rule on that issue. Didn't Mr. Dansby also testify that the extent of the hail damage, or something to this effect, that because of the extent of the damage, it could only have happened, there was no storm big enough except for the March 2013 one? That testimony was in the record, wasn't it? As between, yes, but only as between the March 2013 storm and the July 2013 storm. He had done no research or investigation to determine whether any of the previous storms that we identified for him in his deposition on cross-examination were sufficient to have been able to cause these dents that he saw and he testified that they could have in his deposition. So, that was an issue that was raised in the Daubert pretrial that was never ruled on. As to the district court gatekeeping function, it can make that determination, right? What determination? The determination as to whether there's sufficient fit. I mean, that is within the purview of what the district court does. Correct. And the district court apparently did that because he let Dansby testify. But he never ruled on the issue of fit. He only ruled, he only decided. It seems you want us to oblige an opinion district courts to write to every objection raised in a Daubert motion expressly on the record. And if they don't, after, there could be a fairly simple expert testimony qualification that the district court concludes, you know, is based on a reliable methodology and would be helpful to a jury for it to consider. When we get a jury verdict, if the district court hasn't responded to every jot and tittle of a Daubert motion, we're obliged to set aside a jury verdict and remand for a new trial? Well, in this case in particular, that should be the result because not only were the Daubert challenges not ruled on, but they were essentially kicked down the road, which is fine that he said, I'm going to hang on to these and we're going to see how this trial plays out. And Mr. Kendall, you know, you can make your motions when it's time. And we did. And we made a Rule 50 motion that renewed our motions for a directed verdict that were at the conclusion of the case. And in those, we raised those issues again that the judge had not considered, primarily the methodology issue and the fit issue. And what ended up coming out at trial was that Mr. Dansby testified as to what his methodology is. And his methodology, according to his own testimony, not only on cross-examination at trial, but in his deposition, was that in order to make a determination as to whether there's hail damage on a roof, he has to get on the roof and touch it. He's got to put his finger in the dent and see whether the underlying mat is bruised. And he didn't do that in this case. Well, he didn't do that with respect to every tile on every roof. That's right. He did do that with respect to at least some tiles on some roofs. That's correct. Correct. In fact, all the roofs except five or six. Right. Out of 55. Out of 55. And it appeared from the record that your own adjusters and experts would say that you can do that sort of, we could call it sampling, extrapolation, whatever we want to do a reliable estimate of damage. Isn't that right? Well, you can do it in order to get a reliable estimate of damages, but you can't do it in order to get a reliable opinion on causation. And the reason that that was important in this case is that Dansby agreed that these roofs had what's called Atlas Chalet shingles on them, which are known in the industry to be defective. The expert that property owners put on the stand during the trial testified that all of these shingles, except for on one building, were defective Atlas Chalet shingles and that they exhibit signs of defect that are similar to a hailstorm damage. Dansby agreed, and he agreed on the basis of that he googled Atlas Chalet shingles and he determined that, yes, they were defective. So the primary problem with his testimony in that regard, setting aside the issue of whether you can sample for an estimate, is that you can't sample for causation in a case where the Grand Reserve's own expert testified that there was another possible cause of the defects that he saw. He also testified, however, that he looked for that and saw some and deducted that from his estimate of damages, did he not? No, Your Honor. He never deducted anything from his estimates. Did he testify that he did? No, not to my recollection, Your Honor. My law clerk said that, and I haven't read the testimony myself, but I will read it. My understanding of the estimates that he prepared were to remove every shingle on every roof and replace every shingle on every roof, regardless of whether he made some determination that it was a defective Atlas Chalet shingle or whether he made a determination that it was hail damage, because his testimony at trial was that it was all hail damage. And so therefore, his estimate was to strip all the shingles off, all the felt off, and replace it with brand new shingles, which incidentally, the shingles that he quoted and he told the jury in terms of his pricing were shingles that were different from the shingles that Grand Reserve originally had on the building. Well, they were both 30-year shingles. They were 30-year shingles. And that's what he used in his mind. But one's cheaper than the other, and that testimony is even confirmed by Grand Reserve's owner, Steve Corbett, who is also a contractor and testified about how he has a contractor business, that the 30-year shingle is an architectural shingle that is not a laminate shingle and that the shingles that he had on his roof were cheaper. They were somewhere in the middle. So you either have this three-ply, single-layer shingle, or you have a double-ply shingle, and these are in the middle. And that's all evidence that the jury can consider. Well, it is, except how does an expert, a person who is testifying under the cloak of being an expert, why should he be able to tell the jury that that is so if he has no background, he has no understanding as to how those estimates were prepared? He's using a software program. In other words, Dansby didn't sit down with pen and paper and calculate, you know, based on my knowledge and experience, this is what a shingle costs. Based on my knowledge and experience, this is how much it costs to take it off. He just goes out there and he gets measurements and he plugs it into a system that's created by someone else that spits out estimates of in this locale, based on this geography and based on this time frame, this is how much it costs. Yes, you know, though, there are two things here. There's one, his testimony about causation, which it seemed to me at least the district court ruled, it satisfied Dobbert, about the reliability of that testimony. But then there's the testimony about damages. But when that comes up and your adversary offers his calculations on sheet of paper that have been disclosed in discovery, et cetera, your only objection is a hearsay objection. It's not, in fact, the district court asks you, is this an objection, the same objection that's been, that we've heard earlier about reliability? And you say, no, it's because this is a speaking exhibit and a hearsay objection. It seemed to me that you didn't preserve any objection to his damages testimony. Well, we never really had an issue with his damages testimony until the plaintiff closed its case without having introduced the correct measure of damages, which was actual cash value. So I understand your reopening argument. That's a separate argument. You know, that's not a reliability argument. But that's an abuse of discretion standard. But I think my brother has a question. I have a question along the same line because I also understood that you had waived any Dobbert, Dobbert objection to the testimony with respect to damages. With respect to the reopening, your primary argument is Rule 26, Rule 37 argument. And it seems to me that that argument is without merit because it seems to me harmless that the expert's testimony about damages was not disclosed prior to the trial for this reason. The only difference between the replacement value damages that he actually testified to and had disclosed is that you take the depreciation from the replacement value and arrive at the actual cash value, which was kind of a mechanical process that you were very familiar with so that there was no surprise. And furthermore, the calculation of the depreciation was obvious from the record because the age was reflected on the declarations page. How am I wrong? Well, Your Honor, with respect to the estimate that was entered into during the reopening phase of the case, it was not an exactimate driven estimate. The first one that he gave was an exactimate driven estimate. Had he gone and used the exactimate computer program that he used the first time, which he couldn't because he had borrowed it from somebody and he didn't have one himself, had he done that, then I'm sure that property owners would have been okay with an exactimate estimate. The reason that we were prejudiced and the reason that it was harmful is that we don't know what he did over the course of that night. I thought all he did over the course of that night was take the very same replacement value to which he had already testified and subtract depreciation from it. Except he didn't use what is the acceptable method in the industry. And at that point in time, we had no idea what he was using. We had no idea, no time to talk to him about it. We had no time to depose him about it. We had no time to figure out what his method was. That's why we need expert reports. That's why Rule 26 requires them. That's why you need anything in order to calculate depreciation, how many years it's been since this shingle was put up there. Because it can be subjective what the percentages are that you assign to any particular building based on its construction, based upon its age. You might have one person that says, well, for this building, due to its age and due to the construction and due to what I saw out there, I'm going to only depreciate it 10%. Somebody else might depreciate it 20%. That's why the Xactimate is the standard in the industry that he did not go back overnight and use in order to calculate what the depreciation factor would be. Okay, you've saved three minutes for rebuttal, Mr. Ellington. Thank you. May it please the Court. Good morning. Good morning. I wanted to touch on a couple of points that you were asking Mr. Kendall about. Judge Pryor, you asked, you know, wasn't it obvious to everybody that this damage occurred following the March 2013 hailstorm? And what our experts said about that is that this was a massive storm. That he himself had looked at some 200 to 250 roofs at the request of insurance companies, just like property owners, to determine whether there was hail damage. And if so, what the amount of damage would be to make the insurance whole. Under this theory that you heard this morning that we see in the briefs, their theory would only hold up if Mr. Dansby or any other expert had been on the roof on March 17th, determined that there was nothing wrong with the shingle, and then came back on March 19th. And that's just not what reason or the law requires. He went through a methodology that is the same methodology he's used for 26 years when he's hired by insurance companies to determine whether or not there's damage from a hailstorm. Judge Pryor, you asked some questions that I think lead into what is an important point about the fact that they haven't asked for a new trial here. Judge Land made that point a couple of times in his order where he denied this motion for judgment as a matter of law. I believe it's because they do not want a jury to, a second jury, to see all of the same evidence that the first jury saw going around. And so unless Judge Land abused his discretion by letting Mr. Dansby testify under Daubert, which we don't believe he did, unless Judge Land abused his discretion by allowing us to put up this actual cash value, which, as Judge Anderson pointed out, is a mechanical computation where you just subtract a depreciation factor. And, you know, on that point— I take it they were entitled to cross and examine him— They were. —about how he calculated that depreciation deduction, right? Yes, sir. They were. They were also able to, if they had wished to, to call their own experts. They had identified two people on their pretrial order who were the people who had done the estimates for them as part of the normal claims handling process. At the pretrial, Judge Land said, well, you know, who are these other people here? Are they going to be talking about whether there's hail damage? And the response was, no, they're only damages witnesses. They would be coming to testify about damages. So they could have brought people to, if they didn't like Judge, if they didn't like Mr. Dansby's calculation, then they could have brought somebody up to say, here's how he did it wrong. In fact, every one of their adjusters makes that kind of depreciation subtraction from replacement value every time they have to calculate actual cash value when the policy covers only that instead of replacement value. Is that not true? That is true, and they did it here. Tell me about this software that he says they should have used and they didn't use and how, it seems to me, I also remember that the insurance company's own lawyer, in his calculation of what they offered, calculated this depreciation and used a depreciation figure which was more favorable to the insured than did Dansby. Am I right about that? You are absolutely right, Your Honor. Mr. Dansby's calculation, which he did do by hand, but keep in mind, it requires two data points. As Judge Anderson, you've already pointed out, it requires that somebody know the age of the buildings with the roofs, which we did because that evidence was already submitted. It was on the declarations page for each building. It says how old these roofs are. The other thing you need to know is what the life expectancy of the roof is, and everybody knew that as well. This was equally known information, equally available, equally accessible, and so it is not a fatal flaw that Mr. Dansby didn't do the depreciation calculation using Xactimate when it is a simple calculation that he's known how to do for 26 years, and you're right. Mr. Dansby indicated that because he actually went in by hand and looked at the age of each building, that his actual cash value estimate was actually more accurate than the one he had reviewed that appellant's own claims adjusters had done. It was more accurate and it was also more favorable to the appellant, as it turned out. So, you know. You explained that you put forward evidence of replacement costs rather than actual cash value because the defendant didn't raise that pretrial, but you're the plaintiff responsible for calculating your damages, and couldn't you tell from the policy that actual cash value was actually the measure of damages here? Well, no, and I describe this as sort of a catch-22 in the policy. It is obvious that the insured is only entitled to the full replacement cost once the repairs are made, but what is not obvious is how that policy language fits into the context that we found ourselves in at trial where the insured has bought a replacement cost policy. He's paid the premium for full replacement cost, and the insurance company has said, we don't think your roofs are damaged by hail, so we're not paying you actual cash value either for 90% of the claimed damage. So, in that context where you have to have a jury decide what are the damages, I just don't think that it is obvious on its face that the only measure of damage that we could have asked the jury for is this actual cash value. I think that what we did was appropriate in terms of having Judge Land exercise his discretion to allow us to add this extra piece of evidence about actual cash value, but I don't think that it's accepted or necessarily so that that was the only thing that could have happened. I think that the jury could have awarded replacement cost value and that property owners at that point could have availed itself of the benefits of its contract by saying, okay, we understand the jury has found hail damage on all of these roofs and that the estimate to replace all of the roofs is replacement cost. You understand we only owe you actual cash value until you do the repairs. We could have had a special verdict form that says that the full amount is not owed even less the insured does replace. So, you know. And I agree that's a separate question from whether or not the district court abused his discretion. Yes. I was just curious about that. Yes. That's right. So, I guess from our perspective, I think it is significant that they haven't asked for a new trial here. They've only asked to reverse the judge as a matter of law. A new jury, you know, this court has the discretion. If you find that Judge Land abused his discretion on any of these fronts, you know, one of the options you have is a new trial, but a new trial would involve all of the same evidence that this jury heard. And they haven't asked for a new trial. They don't want a new trial. It's kind of hard to keep straight what the arguments are. I had thought from the brief that the argument was that the Daubert ruling had to come before trial, but that's been conceded here. That seems to have been conceded. So, yes. It is true, is it not? In fact, I think your opponent conceded this in oral argument, but it seemed to me to be true that with respect to causation, all of the questions that needed to be asked were asked, and the insurance company had an opportunity to cross-examine, and the judge ruled before, before any of the opinion evidence on causation came in. Yes, Your Honor. And with respect to, I thought he was claiming a Daubert with respect to opinion on damages also, but he waived that by failing to object. Correct. There was no objection to Mr. Dansby's opinions about damages. There was no objection before trial. One of the things that jumps out at you when you look at the list of documents that were submitted. With respect to the judgment as a matter of law and whether you had presented a necessary element of your damages. Yes, that's right. As opposed to the reopening. That all goes to the reopening. That all goes to reopening, right. What I was going to say is that they didn't attach the brief that they filed pre-trial where they challenged Mr. Dansby's qualifications and methodology. They only submitted in the appellate record here the boilerplate motion. If you were to look at the brief, it doesn't have anything to do with his damages calculations. It's all about his opinions on causation, and as we can see in the transcript. Well. If it's not in the record. Yes, sir. I don't know what I can. I don't know about it. That is right. I think my point being its absence is conspicuous to me. That the actual arguments that were made at that stage. I know some trial courts don't require the filing of briefs in the record. I've never understood that. I don't understand why that's not in the record. But whatever. It's the appellate's obligation to get an accurate record that would allow us to provide meaningful appellate review. Right. There was a question earlier about Mr. Edmondson, their expert. And how many roos he went on and the significance of that. I think it's important to note that Mr. Edmondson actually did render an opinion about whether there was hail damage or not. Based on only looking at 12 roos. That, you know, we know that because they denied the claim at a point in time when he had only looked at 12. Right. So that was, I think, an error. Well, I'm happy to answer any more questions in my remaining two minutes if there are any. We always appreciate time being given back to us. Yes, sir. Thank you. Thank you, Mr. Ellington. We would just ask that Judge Land's motion that denied the motion for judgment be affirmed. Thank you. I don't think Judge Land made a motion, but I think you want the judgment affirmed. Mr. Kendall. Thank you, Your Honor. With respect to the depreciation that property owners did and whether it was more favorable to the insured or less favorable, the only items that property owners agreed to pay for prior to suit being filed related to metal their expert did eventually go on all of the roofs out there. And his testimony was that there was no hail damage to the shingles themselves, but that there was damage to the metal because there were dents on the metal. And so what property owners depreciated was metal, not shingles. So to the extent that there was a depreciation factor that was different, it wasn't because they applied a more favorable, necessarily a more favorable depreciation factor to the metal. It was because they were dealing with two different types of substances. Secondly, you know, Dansby testified that he was an insurance adjuster for 26 years. He was questioned in his deposition about whether he did the actual cash value calculation, and he said no, he wasn't asked to. He had represented, he's only ever been an expert twice, which is okay, but the other time that he was an expert, he was an expert for Grand Reserve on one of its roof claims because it had a roof claim over in Alabama with respect to a hail storm. Well, you just said that he had 26 years of experience. In insurance. Right, in insurance, working with a number of insurance companies, and he testified that he had inspected like a thousand roofs for hail damage. Correct. In your brief, you say, you're talking about the license, but then you say Dansby lacks any other qualifying expertise. Indeed, the best Dansby can say about his qualifications was to claim that he has met with roofers and engineers to discuss what is and is not hail damage, and I think that violates your duty of candor to this court, and I'm concerned about that. Well, Your Honor, I think the distinction that we were drawing there was not necessarily between his roofing experience versus, for instance, our experts' roofing experience, but that he had zero experience with respect to Atlas-Shallie shingles, which was the crux of the trial. Well, that's not what you say here in your brief. Well, I apologize, and that's what we were trying to drive at, was that the crux of the trial was that there was a, was it hail damage or was it an Atlas-Shallie shingle? And Dansby lacked the experience to determine whether it was an Atlas-Shallie shingle defect that he was looking at or whether it was hail damage that he was looking at. But getting back to my other point, if Dansby knew all along that he could only collect, that Grand Reserve could only collect actual cash value, which he did since he's been in the business for so long, he testified to that in his deposition, he testified to that on cross-examination at trial, then it should have come as no surprise to anyone on the plaintiff's side, on Grand Reserve's side, that that was the measure of damages and that he needed to give an opinion about it. Thank you. Okay, Mr. Kendall, I think we have your case. Thank you. We'll hear the last case for the week.